IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Karen C. Briggs, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 4:14-CV-705-PMD-KDW |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Low Country Home Medical Equipment Company and Mark Baty, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

Plaintiff Karen C. Briggs ("Briggs" or "Plaintiff"), filed this action against her former employer, Low Country Home Medical Equipment ("LCHM") and Mark Baty ("Baty") [collectively referred to herein as "Defendants"], alleging discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, 12112(b), as amended, and the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). Plaintiff also brings state-law-based claims for intentional infliction of emotional distress ("IIED," also known as outrage) and for negligent retention and supervision. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Defendants' Motion for Summary Judgment, ECF No. 27, in which they argue LCHM is not an entity covered by the ADA or ADAAA and, alternatively, they are entitled to judgment as a matter of law based on the relative merits of the ADA and ADAAA claims, as well as the state-law-based claims brought by Plaintiff. Having considered the Motion, Memorandum, and exhibits; Plaintiff's Response, ECF No. 30; Defendants' Reply, ECF No. 31; and applicable law, the undersigned recommends that Defendants' Motion for Summary Judgment be *granted* and this matter be ended.

## I.     Introduction

In considering Defendants' Motion, the court considers all evidence in the light most favorable to Plaintiff. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nonetheless, as noted by Defendant, Plaintiff has not complied with Local Civil Rule 7.05 to provide a "concise statement of the material facts in dispute with reference to the location in the record" in her responsive brief. Local Civ. Rule 7.05(A)(4) (D.S.C.). In fact, Plaintiff includes no statement of facts in her responsive memorandum. Further, Plaintiff's only citation to a portion of the record appears to have been included by mistake as it references the deposition of an individual, "Engec," who is unrelated to this matter. *See* Pl.'s Mem. 4. Plaintiff also generally references another individual, "Defendant Timothy Smock," Pl.'s Mem. 1, who is not a defendant herein, nor is he otherwise related to this matter.[1] Although Plaintiff does reference several individuals who are related to this litigation—Baty, Matt Shelbourne, and Deborah Nuzum—she does not provide record evidence to support her references. *Id.* at 3-4.

As Defendants' statement of the facts is not properly contested, Defendants' factual statement could appropriately be considered undisputed for purposes of this Motion. *See Cox v. Se. Serv. Grp.*, No. CA 4:12-189-RBH-KDW, 2012 WL 3236145, at *2 (D.S.C. July 20, 2012) report and recommendation adopted, No. CA 4:12-CV-00189-RBH, 2012 WL 3236110 (D.S.C. Aug. 7, 2012) (denying without prejudice defendant's motion to dismiss for failure to comply with Local Civ. Rules 7.04 and 7.05); *see also Trexler v. Giese*, No. 3:09-144-CMC, 2010 WL 3218883, at *2 (D.S.C. Aug. 12, 2010) (same). *Counsel are reminded that compliance with*

---

[1] Plaintiff also references several causes of action not raised in her Complaint (federal age discrimination claim and state-law-based claims for wrongful termination and interference with contractual relations). Pl.'s Mem. 1, 5-6. Such claims are not part of this litigation and need not be analyzed herein.

*Local Civil Rule 7.05(A)(4) and other Local Rules concerning motions and memoranda is mandatory. See* Local Civ. Rule 7.05(A) (setting out items a memorandum concerning a motion "shall contain"). The following statement of facts is taken in large part from Defendants' Memorandum. In any event, in this instance, the court will also consider herein relevant facts as argued by Plaintiff to the extent they have record support.

## II.     Factual Background

LCHM is a South Carolina corporation located in Florence, South Carolina. Aff. of Matt Shelbourne ¶ 2, ECF No. 27-4;; Baty Aff. ¶ 2, ECF No. 27-3. LCHM is owned by Baty, Shelbourne, and Pamela Vereen. Shelbourne Aff. ¶ 3; Baty Aff. ¶ 3. LCHM sells and rents durable medical equipment such CPAP and BiPAP machines. Aff. of LCHM General Manager Deborah Nuzum ¶ 3, ECF No. 27-7; Shelbourne Aff. ¶ 7; Baty Aff. ¶ 7. LCHM provides sleep-aiding machines to patients whose physicians have prescribed the machines' use. Nuzum Aff. ¶ 3; Shelbourne Aff. ¶ 7; Baty Aff. ¶ 7. Typically, a patient would present a prescription for a machine to LCHM; and LCHM would provide the patient with a machine (usually on a rent-to-own basis), properly fit the related parts such as a mask, and train the patient how to use the machine. Thereafter, LCHM might also provide follow-up services, commonly referred to as "compliance" visits. If a patient chose not to continue use of the machine, LCHM would have the patient return the machine to the LCHM office. Nuzum Aff. ¶ 3; Shelbourne Aff. ¶ 7; Baty Aff. ¶ 7.

The costs of these machines often are covered in part by health insurance policies or by Medicare/Medicaid. Based on governmental regulations and health insurance contractual requirements, LCHM uses certified respiratory therapists ("RT") to meet with patients who have been prescribed a sleep-aid machine. Nuzum Aff. ¶ 3; Shelbourne Aff. ¶ 8; Baty Aff. ¶ 8. The RT is responsible for fitting the patient with the correct machine and related equipment,

educating and training the patient on proper use, and providing any needed follow-up. Pl.'s Dep. 27, ECF No. 27-8. The RT may also occasionally have to pick up a machine when a patient decides not to comply with the physician's prescription. *Id.* at 29-30. Most of the patient contact is at the LCHM office. Occasionally, however, the RT will visit the home of the patient, or even more seldom, as an accommodation to the patient, meet the patient at a sleep lab. Shelbourne Aff. ¶ 8; Baty Aff. ¶ 8.

Sleep-aid prescriptions are most often provided by physicians affiliated with "sleep labs." These sleep labs often are owned by physicians or physician groups who practice in the specialty of cardiology. Shelbourne Aff. ¶ 7; Baty Aff. ¶ 7. The majority of the prescriptions presented to LCHM at their Florence office were from the Eastern Carolina Sleep Center ("ECSC"), which was owned and operated by Pee Dee Cardiology, a physician-owned cardiology practice. Shelbourne Aff. ¶ 20; Baty Aff. ¶ 20; Affidavit of Pee Dee Cardiology's Chief Operating Officer, Jerry M. Vereen ¶ 2, ECF No. 27-5. Beginning in late 2011 or early 2012, LCHM also began providing services to patients who had prescriptions from the Seacoast-Loris Sleep Lab ("Seacoast"), in Loris, South Carolina. Shelbourne Aff. ¶ 21; Baty Aff. ¶ 21. Seacoast was also owned and operated by Pee Dee Cardiology. Shelbourne Aff. ¶ 21; Baty Aff. ¶ 21; Vereen Aff. ¶ 2.

Plaintiff was employed by LCHM as a RT from May 2009 through May 22, 2013. Compl., Pl.'s Dep. 22. Her job duties included going over sleep studies for purposes of insurance coverage and meeting with patients to set up the machines and to explain how to operate and clean them. Plaintiff usually met with patients at the LCHM office *Id.* at 25-28. Another RT, Catherine Rhodes ("Rhodes"), also worked as an RT on a contract basis. In 2012, LCHM hired Rhodes to meet with patients in the Loris area, where LCHM had begun servicing patients. Shelbourne Aff. ¶ 12; Baty Aff. ¶ 12. There was no LCHM location in Loris, so RTs working

4

there would meet with patients at the Loris sleep lab (Seacoast). After Rhodes' employment with LCHM ended in February of 2013, Plaintiff began traveling to the Loris area one day per week for four weeks to see LCHM patients there. Shelbourne Aff. ¶ 12; Baty Aff. ¶ 12. Plaintiff was "very vocal about not wanting to travel to the Loris area." Nuzum Aff. ¶ 7. In March of 2013, LCHM hired Kim Tanner ("Tanner") a licensed RT, in part, to cover the Loris area patients. Shelbourne Aff. ¶ 13; Baty Aff. ¶ 13. After Tanner began employment, Plaintiff did not make any further trips to the Loris area on behalf of LCHM. Shelbourne Aff. ¶ 13; Baty Aff. ¶ 13.

Baty and Shelbourne are also partial owners of Fordham, Inc. ("Fordham"), a South Carolina corporation located in Columbia, South Carolina, during the time relevant to this action. Shelbourne Aff. ¶¶ 5-6; Baty Aff. ¶¶ 5-6. Fordham is also a durable medical equipment business. Nuzum Aff. ¶ 3; Shelbourne Aff. ¶ 5; Baty Aff. ¶ 5.[2] On occasion, LCHM and Fordham shared some personnel as a cost-saving measure. LCHM and Fordham used the same person, Abigail Wiley, to act as office manager for both, and the two companies utilized the same billing office employees. Shelbourne Aff. ¶ 9; Baty Aff. ¶ 9. LCHM and Fordham would pay their share of the costs of the office manager and billing office. Shelbourne Aff. ¶ 9; Baty Aff. ¶ 9. On occasion, if an employee of LCHM was out, an employee for Fordham would help with the absent employee's patients, and vice versa. Shelbourne Aff. ¶ 9; Baty Aff. ¶ 9. On such occasions, the companies did not separate and charge the other company for the employee's work. Otherwise, LCHM and Fordham operated as separate companies: separate employer identification numbers; separate financial statements; separate corporate records and meetings; and separate tax returns. Shelbourne Aff. ¶ 9; Baty Aff. ¶ 9.

---

[2] For purposes of their Motion for Summary Judgment only, Defendants allow that LCHM and Fordham may be considered to be "interrelated companies." Defs.' Mem. 7 n.1. This information is relevant to Defendants' argument that the LCHM is not a "covered entity" under the ADA.

In April 2013 Fordham lost a significant contract and became a questionable going concern. In addition, LCHM was seeing fewer patients each month. Because of these concerns, LCHM hired Nuzum to evaluate and manage LCHM's operations. Nuzum Aff. ¶ 2; Shelbourne Aff. ¶ 14; Baty Aff. ¶ 14. Nuzum had a number of years of experience in the durable medical equipment business. Nuzum Aff. ¶ 3; Shelbourne Aff. ¶ 14; Baty Aff. ¶ 14. LCHM planned for Nuzum to handle the management duties for LCHM, oversee the almost-dormant business of Fordham, and analyze what could be done to return LCHM to a healthy financial status. Nuzum Aff. ¶ 2; Shelbourne Aff. ¶ 14; Baty Aff. ¶ 14. In early May 2013, Nuzum, Baty, and Shelbourne met to discuss Nuzum's analysis, at which time Nuzum opined that LCHM could not afford to continue to employ two full time respiratory therapists. Nuzum Aff. ¶ 6; Shelbourne Aff. ¶ 15; Baty Aff. ¶ 15. At that time LCHM employed both Plaintiff and Tanner. Plaintiff had advised Nuzum that she (Plaintiff) did not want to travel to Loris on a regular basis. Nuzum Aff. ¶ 7. Nuzum met with Tanner in early May 2013, and Tanner advised Nuzum she would be willing to work in both the Florence and Loris areas. Nuzum Aff. ¶ 7. Plaintiff testified that she was not approached about covering both Florence and Loris on a long-term basis. Pl.'s Dep. 104.

In additional May 2013 discussions among Nuzum, Baty, and Shelbourne, it was decided that in order to avoid further financial losses, LCHM needed to reduce its workforce to one RT. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16. All three were aware that Plaintiff did not want to have to travel to work in Loris and that Tanner was willing to work in both areas serviced by LCHM. Nuzum Aff. ¶ 7; Shelbourne Aff. ¶¶ 15-16; Baty Aff. ¶ 16. Baty and Shelbourne also recognized that Tanner's salary requirements were lower than Plaintiff's. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16. It was decided that Nuzum would terminate Plaintiff's position and have Tanner cover both areas. Nuzum Aff. ¶ 8; Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16. The decision to terminate Plaintiff was made more than a week prior to her actual termination. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16.

Nuzum was to determine when the termination would occur. Nuzum Aff. ¶ 10. Nuzum terminated Plaintiff more than a week after this final meeting with Baty and Shelbourne. Nuzum Aff. ¶ 10; Shelbourne Aff. ¶ 17; Baty Aff. ¶ 17.[3] During all of these meetings, there were no discussions related to Plaintiff other than her unwillingness to travel to Loris. There were no discussions about any of her health concerns, diagnosis, or recent or planned tests. Nuzum Aff. ¶ 9; Shelbourne Aff. ¶ 17; Baty Aff. ¶ 17. Neither Baty nor Shelbourne had any knowledge of any health concerns, diagnosis, or recent or planned tests related to Plaintiff. Shelbourne Aff. ¶ 17; Baty Aff. ¶ 17.[4] On May 22, 2013, Nuzum informed Plaintiff of her termination. Shelbourne Aff. ¶ 17; Baty Aff. ¶ 17.

III.    Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth

---

[3] From its independent review of Plaintiff's deposition, the court notes Plaintiff testified that, on the day Nuzum terminated her, Nuzum indicated the decision for the termination had taken place at an "owners' meeting" held the night before the May 22, 2013 termination. Pl.'s Dep. 51-52.

[4] Nuzum indicated in her affidavit that, at the time of her meeting with Shelbourne and Baty at which time they determined Plaintiff would be terminated, she had no knowledge of any of Plaintiff's "health issues." Nuzum Aff. ¶ 9. The court notes this arguably is at issue with Plaintiff's deposition testimony that, on the first day she met Nuzum, Nuzum told her and another employee, Sandra McElveen, that Nuzum had previously fought breast cancer. Pl.'s Dep. 48-49. During that first meeting, Plaintiff shared with Nuzum that both her sister and mother had had cancer and that "they were watching" Plaintiff, as well. Pl.'s Dep. 49. Plaintiff also testified that on the day before she was terminated she had given Nuzum her timesheet and advised that the timesheet reflected a morning she had been out to have an ultrasound test. She told Nuzum she possibly would need to be out again, but she had already contacted another RT who could cover for her. Pl.'s Dep. 50-51. Plaintiff testified that she had not received the results of her then-latest ultrasound on the day she was terminated. When she did receive the results, she learned she did not have breast cancer. She testified that she was being followed and examined based on a benign lump the doctors were watching. Pl.'s Dep. 92-93, 101-03. In any event, as discussed within, this potential dispute does not impact the court's analysis or recommendation.

specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should

examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

IV.    Analysis

    A. Plaintiff's ADA disability discrimination claim

        1.   Applicability of the ADA: Integrated-employer test

Under the ADA, a "covered entity" may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §§ 12111(2), 12112(a). In a discrimination claim under the ADA and the ADAAA, the plaintiff must first show the defendant is a covered entity. A covered entity includes "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). An employer is defined as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 12111(5)(A). *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006) (holding in Title VII context that 15-employee threshold is an element of a plaintiff's claim for relief on which the plaintiff bears the burden of proof, rather than a jurisdictional issue). *See id.* at 509 (noting 15-employee threshold of Title VII and ADA "resembl[ed]" one another).

9

Defendant first argues Plaintiff's ADA claim fails as a matter of law because LCHM is not a "covered entity" subject to the ADA. Defs.' Mem. 7-13. For argument's sake only, Defendant notes LCHM can be combined with Fordham for purposes of determining whether the 15-employee threshold is satisfied. Defs.' Mem. 7 n.1. Baty and Shelbourne state in their affidavits that during the applicable years (2012 and 2013), LCHM normally employed 2 or 3 employees, Fordham employed 1, and LCHM and Fordham shared no more than 7 employees. According to Defendants, the maximum number of employees that LCHM and Fordham had combined in any given week was 11, meaning LCHM does not satisfy the 15-employee threshold and is not a covered entity under the ADA and ADAA Baty Aff. ¶¶ 10-11; Shelbourne Aff. ¶¶ 10-11.

In her response, Plaintiff does not dispute that LCHM and Fordham alone do not meet the 15-employee threshold. Rather, she argues that "Defendant and all of his business[es] work together as an integrated employer." Pl.'s Mem. 2.

Under the integrated-employer test, several companies may be considered so interrelated that they constitute a single employer. *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441-42 (4th Cir. 1999) (considering the definition of "employer" in the Family Medical Leave Act ("FMLA") context) (abrogated on other grounds in *Arbaugh,* 546 U.S. 500). In determining whether an integrated enterprise exists, courts look to four factors: 1) common management; 2) interrelation between operations; 3) centralized control of labor relations; and 4) degree of common ownership or financial control over the entities. *Id.* However, no single factor is conclusive. *Hukill*, 192 F.3d at 441-42. *Arbaugh* was decided in the Title VII context and determined that statutory scheme's 15-employee threshold was an element of a plaintiff's case, rather than a jurisdictional requirement. In *Reynolds v. American National Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012), the Fourth Circuit Court of Appeals found *Arbaugh* applicable to ADA claims, as

well. When discussing the factors to be considered in an integrated-employer analysis, the *Hukill* court noted these factors were applied in cases involving other civil rights statutes, including the ADA. *See Hukill*, 192 F. 3d at 442 n.6.

Citing the appropriate integrated-employer test, but proffering no record evidence to support her argument, Plaintiff submits that three businesses—LCHM, Fordham, and Medical Solutions Staffing ("MSS")—combine to create an integrated employer. Pl.'s Mem. 3 ("Defendant establishes a relationship between [LCHM, Fordham, and MSS], where two owners Baty and Shelbourne compensate the employees for one interrelated business of sleep labs and exercise common control."). Plaintiff does not discuss the facts presented by Defendant, nor does she otherwise offer any analysis explaining why LCHM, Fordham, and MSS should be considered "integrated" for purposes of determining whether the ADA is applicable to LCHM. Defendants note in their Memorandum that Plaintiff did no discovery regarding any other companies that may be owned or co-owned by Defendant Baty or operated in a manner that could be considered as integrated with LCHM. Defs.' Mem. 8. Plaintiff does not dispute this statement in her response to Defendants' Motion, nor does she provide any documentary or testamentary evidence to support her argument that LCHM, Fordham, and MSS should be considered as one for purposes of the employee-threshold analysis. Based on this failure alone, Plaintiff's ADA claim could be dismissed, as Plaintiff is required to establish her employer has 15 or more employees as an essential element of her ADA claim. *Arbaugh*, 546 U.S. at 509, 516. In providing this Report for the United States District Judge's review, however, the undersigned further considers the parties' arguments and the available corporate evidence regarding MSS, which was provided by Defendants.[5]

---

[5] In her deposition, Plaintiff testified that LCHM employed those who worked at the sleep labs (ECSC and Seacoast) because she understood they received their payroll checks from LCHM.

The record evidence indicates that MSS, which is jointly owned by Baty and Shelbourne, "provides staffing to a number of healthcare organizations, primarily sleep labs located throughout eastern South Carolina, including ECSC and Seacoast." Baty Aff. ¶ 23, Shelbourne Aff. ¶ 23.[6] Baty and Shelbourne state that MSS is operated completely separate and distinct from LCHM, Fordham, or any other company. Baty Aff. ¶ 23, Shelbourne Aff. ¶ 23. Defendants argue that the relationship between LCHM (owned by Baty, Shelbourne, and Pamela Vereen) and MSS (owned by Baty and Shelbourne) does not support an argument that LCHM, Fordham, and MSS should be considered integrated based on the *Hukill* factors. Defs.' Mem. 11-12.

Plaintiff's only discussion of the integrated-employer argument is that "Defendant establishes a relationship between [LCHM], Fordham and [MSS], where two owners Baty and Shelbourne compensate the employees for one interrelated business of sleep machines and sleep labs and exercise common control." Pl.'s Mem. 3. She contends, again with no citation to record evidence, "these three businesses alone" provide "enough evidence to determine the existence of an integrated employer." *Id.*

The undersigned agrees with Defendants that the integrated-employer argument is unavailing here. In considering the first *Hukill* factor—common management—evidence

---

Pl.'s Dep. 40-42. Plaintiff also submitted that Baty and Shelbourne owned the sleep labs although her testimony regarding that ownership was based on her inexact recollection. *Id.* at 43-44 (noting she did not recall what was said that made her believe Baty owned a sleep lab other than his "being very concerned" about how the labs were run). Based on that testimony and in trying to anticipate Plaintiff's argument about possible integrated entities, Defendants provide details of the ownership of ECSC and Seacoast. *See* Defs.' Mem. 9-10 and Baty, Shelbourne, and Vereen Affs. Plaintiff has apparently abandoned her focus on the sleep labs (or their corporate owner, Pee Dee Cardiology) as being entities that should be integrated for purposes of determining LCHM's employee-count. In her response to Defendants' Motion Plaintiff argues that the court need only consider the combined employees of LCHM, Fordham, and MSS. Pl.'s Mem. 3. Accordingly, the court will not detail the additional evidence Defendants proffered regarding the ownership of ECSC and Seacoast. Nonetheless, the undersigned has reviewed the evidence presented and, to the extent Plaintiff continues to claim ECSC and Seacoast should be integrated with LCHM (or LCHM and Fordham), such argument should fail.

[6] When asked about MSS in her deposition, Plaintiff stated she had not heard of it. Pl.'s Dep. 80.

indicates that the day-to-day management of LCHM and MSS was handled by different persons. LCHM was managed by Nuzum (and, before she began, Abigal Wylie). MSS was managed by Glen Sullivan. Shelbourne Aff. ¶¶ 9, 14, 25; Baty Aff. ¶¶ 9, 14, 25; Aff. of Steven Glen Sullivan ¶ 1, ECF No. 27-6. Sullivan affirms, *inter alia*, that he is the MSS Technical Director and is responsible for ensuring clients have their labs fully staffed. He further notes he is compensated only by MSS and has never done any work for LCHM or Fordham within the past 10 years. Sullivan Aff. ¶¶ 1, 3. These facts are not disputed by any cogent evidence and suffice to show no common management on a day-to-day basis. That Baty and Shelbourne are involved in both entities does not change this finding.

The second *Hukill* factor considered is the interrelation of operations between LCHM and MSS. The only record evidence is that they operated separately. For example, they have separate insurance policies, including separate errors and omissions insurance. LCHM and MSS do not share offices, nor do they have offices in common. Shelbourne Aff. ¶¶ 24, 26; Baty Aff. ¶¶ 24, 26. The employees of MSS do not work for LCHM, nor do LCHM employees work for MSS. Shelbourne Aff. ¶¶ 29, 33; Baty Aff. ¶ 29, 33. MSS and LCHM maintain separate bank accounts and accounting systems. Shelbourne Aff. ¶ 26; Baty Aff. ¶ 26. Further, the entities are not party to joint or related contracts and are not involved in contract negotiations for the other entity. Shelbourne Aff. ¶ 30; Baty Aff. ¶ 30. The entities hold separate board meetings and file separate tax returns. Shelbourne Aff. ¶¶ 26, 31; Baty Aff. ¶¶ 26, 31.  Plaintiff has proffered no competent evidence to demonstrate any interrelation of operations and has not satisfied this *Hukill* factor.

The third, and "most important" factor according to *Hukill*, is whether there is centralized control of labor relations. *See Hukill*, 192 F.3d at 442. The two companies do not have any interrelation as to their payroll, and actually use two different software systems to administer their payroll. Shelbourne Aff. ¶¶ 27-28; Baty Aff. ¶¶ 27-28; Sullivan Aff. ¶ 6. Baty testifies in

13

detail regarding the payroll of the two companies, noting MSS "did not employ or compensate any of LCHM's personnel[,]" and "LCHM did not employ or compensate any of MSS's personnel." Baty Aff. ¶ 29. Baty notes that he personally handles the details of the MSS payroll, using software on his personal computer that is not accessible on the LCHM computers. Baty Aff. ¶¶ 27, 28. Nuzum noted that she assisted in handling the payroll of LCHM and Fordham, but not for any other entity. Nuzum Aff. ¶ 13. Baty indicates he is involved with the "final part of each payroll process," which includes writing payroll checks. Baty Aff. ¶ 23. Further, the entities do not share a human resources department, nor is there otherwise any centralized source of authority for both companies' personnel policies or decisions. Shelbourne Aff. ¶ 32; Baty Aff. ¶ 32; Sullivan Aff. ¶ 5. Further, LCHM and MSS do not share personnel, and there are no transfers and promotions of personnel between the two companies. Shelbourne Aff. ¶¶ 29, 33; Baty Aff. ¶¶ 29, 33; Sullivan Aff. ¶ 5. Plaintiff has proffered no record evidence to the contrary. In fact, in her deposition she indicated she had never heard of MSS. Pl.'s Mem. 80.

The final *Hukill* factor to be considered is the degree of common ownership/financial control. As Defendants have freely noted, Shelbourne and Baty are both owners in LCHM and MSS. However, LCHM has an additional owner, Pamela Vereen. Shelbourne Aff. ¶¶ 3, 23; Baty Aff. ¶¶ 3, 23. Additionally, neither entity directly owns the other. Shelbourne Aff. ¶ 22; Baty Aff. ¶ 22.

Considering the uncontroverted evidence, the *Hukill* factors do not call for a finding that MSS is to be "integrated" into LCHM in considering whether Plaintiff has shown that LCHM satisfies the 15-employee threshold requirement of the ADA and ADAAA. *See Wauben v. Protega (USA), Inc.*, No. 2:05-2780-PMD-RSC, 2007 WL 775614, at *7-9 (D.S.C. Mar. 9, 2007) (granting summary judgment as to Title VII claim because *Hukill* factors did not indicate a finding that defendant employer and another entity be considered "integrated" for purposes of

14

Title VII's employee-numerosity requirement). Accordingly, the undersigned recommends Defendants' Motion for Summary Judgment be granted as to Plaintiff's ADA/ADAAA claim.

    2.  Merits of ADA Claim

Even if it were determined that Plaintiff has established the integrated-employer test makes LCHM a "covered entity," summary judgment on her ADA/ADAAA claim remains appropriate. To establish a claim for disability discrimination, Plaintiff must prove "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability." *EEOC v. Stowe–Pharr Mills, Inc.,* 216 F.3d 373, 377 (4th Cir. 2000). Disability is defined to include actual and perceived actual limitations. 42 U.S.C. § 12102(3). Disability discrimination may be proven through direct and indirect evidence or through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (citing *Raytheon Co. v. Hernandez,* 540 U.S. 44, 49–50 & n. 3 (2003)).

Here, Defendant focuses on the *McDonnell Douglas* burden-shifting framework in seeking summary judgment. Defs.' Mem. 13-20. Plaintiff offers no cogent legal analysis of the ADA claim; however, because she refers to "pretextual reasons" for termination, Pl.'s Mem. 4, the court presumes she intends to rely on this method of proof. Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of the ADA, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). In any event, under

either method of proof, the plaintiff has the ultimate burden of showing that she was the object of intentional discrimination by the defendant. *Williams v. Staples,* 372 F.3d 662, 666 (4th Cir. 2004).

a. Prima Facie Case

For purposes of their Motion only, Defendants concede Plaintiff has established the first element of her prima facie case—that she had a perceived disability—citing Plaintiff's deposition testimony regarding a noncancerous mass found in 2011. Defs.' Mem. 15-16. Plaintiff was to have ultrasounds every six months so that her healthcare providers could observe the mass. Pl.'s Dep. 94. Plaintiff testified that she had taken time off from her work at LCHM for each ultrasound she had taken since 2011. In May 2013, prior to Plaintiff's termination, Plaintiff states that she informed Nuzum that she had just had an ultrasound, had not received the results, and anticipated she might have to have additional tests. *Id.* at 50-51. Plaintiff's timesheet for the period from April 28 through May 10, 2013 included a notation that she had been off the morning of May 7, 2013 for an ultrasound. *See* ECF No. 27-2 (timesheet provided by Defendants). Defendants note that, based on her having informed Nuzum of the ultrasound and that she might have to get additional tests, arguably LCHM perceived that Plaintiff had breast cancer. Compl. ¶ 9. Defendants do not dispute that breast cancer is a recognized disability under the ADA. Unquestionably Plaintiff has satisfied the second element of her prima facie claim—an adverse employment action—as it is undisputed that Plaintiff's employment with LCHM was terminated on May 22, 2013.

Defendant argues that Plaintiff cannot establish the third or fourth element of her prima facie case. Defendant argues Plaintiff is unable to provide evidence to support she was performing her job at a level that met LCHM's legitimate expectations, pointing to evidence that Plaintiff made it clear to management and co-workers that she did not want to continue traveling

to Loris, South Carolina to work two days each week on a long-term basis. Defs.' Mem. 16-17. Plaintiff does not address this argument in her response. Nonetheless, the undersigns recommends giving Plaintiff the "benefit of the doubt" as to this prong as none of the evidence indicates Plaintiff directly refused an order to continue to work in Loris on certain days. Further, Plaintiff testifies that she was never even approached about working in Loris on a long-term basis. Pl.'s Dep. 104. Defendant has proffered no other evidence regarding Plaintiff's failing to meet work expectations. Accordingly, the undersigned recommends finding the third element of Plaintiff's prima facie case has been satisfied.

Plaintiff is unable to establish a prima facie case, however, because she cannot satisfy the fourth element—that her termination raises a reasonable inference of discrimination. Prior to Plaintiff's termination and her statement to Nuzum about the May 2013 ultrasound, LCHM made the business decision to retain only one of their two RTs. Because LCHM had patients in Florence and Loris, the RT would need to see patients in both locations. Shelbourne Aff. ¶¶ 15-17; Baty Aff. ¶¶ 15-17. As Plaintiff had indicated she did not wish to continue to travel to Loris on a long-term basis, LCHM management approached the other RT, Tanner, regarding the change in her position. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16. Although Plaintiff testified she was never specifically approached about whether she would consider working in both Florence and Loris on a long-term basis, Pl.'s Dep. 104, the record is not disputed that she made it known she did not wish to have to travel to Loris to work. The conversation with Tanner regarding working in Florence and Loris occurred prior to Plaintiff's termination and prior to Plaintiff's statement to Nuzum about the ultrasound and follow-up tests. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16. At the time the decision was made to retain only one RT, the undisputed evidence is that neither Shelbourne nor Baty was aware of any health concerns Plaintiff had. Shelbourne Aff. 17; Baty

Aff. ¶ 17.[7] Additionally, Plaintiff testified that LCHM had been aware of her needs for ultrasounds since 2011, Pl.'s Dep. 93, but did not terminate her until May of 2013. Plaintiff cannot demonstrate the fourth element of a prima facie case of discrimination, making summary judgment as to her ADA/ADAAA claim appropriate.

   b.   Pretext Analysis

Even if it is determined that Plaintiff has set forth a prima facie case, summary judgment remains appropriate. Under the *McDonnell Douglas* framework, once a plaintiff is able to establish a prima facie case for discrimination, the burden shifts to the defendant to provide a non-discriminatory reason for termination. If the defendant is able to provide a non-discriminatory reason for termination, the burden shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for unlawful discrimination. *Reeves*, 530 U.S. at 143.

LCHM unquestionably has presented evidence of a cogent business reason for Plaintiff's termination. As explained, reduced business led to Nuzum's opinion that LCHM needed only one full time therapist, followed by her recommendation to Baty and Shelbourne that the choice of who to keep should be based on which one was willing to travel to the Loris area. Shelbourne Aff. ¶¶ 15-17; Baty Aff. ¶¶ 15-17). Baty and Shelbourne also factored in the lower compensation of the RT who was being retained, a readily supportable business decision. Shelbourne Aff. ¶ 16; Baty Aff. ¶ 16.

Plaintiff provides no facts or cogent argument to support her claim that LCHM's stated reason for terminating her was pretextual. In fact, Plaintiff's only argument of any kind on this point follows:

---

[7] Considering all facts in the light most favorable to Plaintiff, Nuzum may have been aware of Plaintiff's health concerns at the time of the meeting. However, the undisputed record evidence is that any health issues of Plaintiff were not discussed in determining how to handle the RT reduction in force.

> Plaintiff filed a charge of discrimination based on perceived disability, after she
> disclosed to her employer that she had a lump in her left breast that may require
> surgery and that there was a possibility that she had cancer. After making this
> disclosure, Defendant, through its agent Deborah Nuzum, made inquiries about
> Plaintiff's health condition and about Plaintiff's family health history of cancer.
> Defendant's agent, Deborah Nuzum, also made health inquiries to other
> employees. On May 22, 2013, Defendant, through its agent Deborah Nuzum,
> terminated Plaintiff for pretextual reasons and without cause, claiming that
> Defendants no longer had a need for a full time therapist.

Pl.'s Mem. 4. Plaintiff offers no evidence that calls into question the business reasons proffered by Defendants or provides even the slightest indication that the "real reason" Plaintiff was terminated was because of the health information Nuzum had been given. The Fourth Circuit has long "recognized the importance of giving an employer the latitude and autonomy to make business decisions, . . . ." *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 277 (4th Cir. 1995). The court is not to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. Pepsico,* 203 F.3d 274, 279 (4th Cir. 2000) (quoting and citing *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998)). Plaintiff has failed to produce any evidence of pretext on the part of LCHM and has not established a case of discrimination. As such, Defendants are entitled to summary judgment as to Plaintiff's ADA/ADAAA claims.

  B. State-law-based claims

 Plaintiff's Complaint also includes state-law-based claims for intentional infliction of emotional distress and for negligent retention and supervision. Defendants submit that both of these claims are barred by the exclusivity provision in the South Carolina Workers Compensation Act ("SCWCA"). Defendants also seek summary judgment on the merits of these two state-law-based claims.

Defendants move to dismiss Plaintiff's claims for IIED and for negligent retention and supervision because they are barred by the exclusivity provision of the SCWCA, S.C. Code Ann. § 42-1-540. Defs.' Mem. 21-22. The exclusivity provision provides in relevant part as follows:

> The rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against his employer, at common law or otherwise, on account of such injury, loss of service or death.

*Id.* The only exceptions to the exclusivity provision are: (1) when the injury results from the act of a subcontractor who is not the injured person's direct employer; (2) when the injury is not accidental but rather results from the intentional act of the employer or its alter ego; (3) when the tort is slander and the injury is to reputation; or (4) when involving certain occupations expressly excluded by the Act. *Cason v. Duke Energy Corp.*, 560 S.E.2d 891, 893 n.2 (S.C. 2002).

### 1. IIED Claim

In responding to Defendants' Motion concerning her IIED claim, Plaintiff focuses on the second exception listed above, i.e., when the injury is not accidental but results from an intentional act of the employer. Pl.'s Mem. 6. Citing *Stewart v. McLellan's Stores, Co.*, 9 S.E.2d 35 (S.C. 1940), and *McSwain v. Shei*, 402 S.E.2d 890 (S.C. 1991), Plaintiff submits that her "termination based on a medical disclosure and a perception of disability[]" amounted to an intentional act on her supervisor's part and "should not be insulated" by the SCWCA exclusivity provision. Pl.'s Mem. 6.

As discussed in detail above, the record does not support an argument of any intent to harm Plaintiff based on any medical disclosure she may have made or any "disability"

Defendants might have perceived. Accordingly, the SCWCA exclusivity clause bars Plaintiff's IIED claim. That claim should be dismissed as a matter of law.[8]

To the extent the court chooses to consider Plaintiff's IIED claim on its merits, summary judgment remains appropriate. Considering all facts in the light most favorable to Plaintiff, she has not set forth facts that could satisfy the requirements for this intentional tort, i.e., that Plaintiff was subjected to conduct "so extreme and outrageous as to exceed all possible bounds of decency" and that she suffered emotional distress "so severe that no reasonable man could be expected to endure it." *See Melton v. Medtronic, Inc.*, 698 S.E.2d 886, 891 (S.C. Ct. App. 2010) (cited by Plaintiff).

2.   Claim of Negligent Retention and Supervision

Plaintiff does not specifically address Defendants' argument that the SCWCA bars her claim of negligent retention and supervision. Rather, Plaintiff sets out general South Carolina law noting the elements for the tort, submitting without explanation that an "employer may be liable for *negligent* supervision if the employee *intentionally* harms another employee [in certain instances]."[9] Pl.'s Mem. 7 (emphases added). In characterizing her claim for negligent retention

---

[8] The Supreme Court of South Carolina has held that IIED constitutes a personal injury that falls within the scope of the SCWCA. *Loges v. Mack Trucks, Inc.*, 417 S.E.2d 538, 540 (S.C. 1992). The court later affirmed and clarified this holding by stating: "It is only when the tortfeasor/co-employee is the 'alter ego' of the employer that the liability falls outside the scope of the [SCWCA]." *Dickert v. Metro. Life Ins. Co.*, 428 S.E.2d at 701. This "alter ego exception" applies only to "'dominant corporate owners and officers.'" *Id.* (quoting 2A Larson, *Workmen's Compensation*, §§ 68.21 and 68.22). Plaintiff has not raised this argument in discussing her IIED claim. In any event, Plaintiff's supervisor, Nuzum, is not a "dominant corporate owner or officer," and the record contains no evidence that Nuzum or LCHM owners/officers Baty, Shelbourne, or Pamela Vereen acted to intentionally harm Plaintiff.

[9] As correctly set out by Plaintiff, an employer might be liable for negligent supervision when its employee intentionally harms another while on the premises of employer or using chattel of the employer if the employer knows or has reason to know it can control its employee, and knows or has reason to know such control is necessary. Pl.'s Mem. 7 (citing *Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992)). However, *Degenhart* considered that tort in connection to a duty "an employer may owe to third parties for the acts of its employee[,]" *id.*,

21

and supervision, Plaintiff indicates "Defendants were aware of the complaints of Plaintiff and failed to address or correct the behavior of Nuzum." *Id.* Despite being "aware of complaints, Defendants continued to support Nuzum's behavior which enabled her to ultimately terminate Plaintiff." *Id.*

The undersigned finds Defendants are entitled to summary judgment as to the claim of negligent retention and supervision. Plaintiff has presented no controlling or persuasive authority that would have this negligence-based claim somehow be considered an intentional tort for which an employer could be liable under the SCWCA. The SCWCA exclusivity provision applies to this claim, making summary judgment appropriate. In addition, the undersigned is unaware of any record evidence to support Plaintiff's assertion that there were "complaints" about Nuzum about which Defendants were aware. Summary judgment is appropriate as to this claim.[10]

C.  Claims against Defendant Baty

Defendant Baty seeks summary judgment as to claims brought against him. Defs.' Mem. 22-23. As noted on reply, Plaintiff did not oppose this portion of Defendants' Motion.  Summary judgment as to all claims against Defendant Baty is appropriate. Further, for the reasons discussed above, Plaintiff has not set forth a claim that survives summary judgment as to any party.

---

making that analysis inapplicable here. In any event, the record contains no facts that could suggest LCHM had reason to believe it needed to control Nuzum.

[10] Inexplicably, Plaintiff also cites a Title VII hostile-work-environment case, *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998), as further support for her state-law-based negligent supervision/retention claim. Pl.'s Mem. 7-8. Plaintiff's Complaint does not include a claim of a hostile work environment, nor has she in any manner proven one. *Faragher* is inapplicable to Plaintiff's state-law-based claim.

V.      Conclusion and Recommendation

For the reasons set forth herein, it is recommended that Defendants' Motion for Summary

Judgment, ECF No. 27, be granted and this matter be ended.

IT IS SO RECOMMENDED.

August 31, 2015                                        Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**